OPINION
Amanda Kelley and Ronald McCormick, Sr. appeal from two judgments of the Clark County Court of Common Pleas, Domestic Relations Division, Juvenile Section, which awarded permanent custody of three children to the Clark County Department of Human Services ("CCDHS") and terminated the parental rights and duties of Kelley and McCormick. Kelley is the natural mother of the three children: Cameron Kelley, born March 23, 1992; Ronald McCormick, Jr. ("Ron Jr."), born April 4, 1994; and Chastain McCormick, born August 27, 1995. McCormick is the natural father of Ron Jr. and Chastain.
The evidence presented by CCDHS established the following. In April 1995, CCDHS became involved with Kelley due to reports that her children were being neglected and that the physical condition of her home was inappropriate for the children. CCDHS initiated a case plan for Kelley which listed certain objectives for Kelley to achieve, including attending parenting classes, utilizing protective day care services for the children, and cooperating with CCDHS counseling and case management. CCDHS also agreed to provide Kelley with a parent aide homemaker ("homemaker") who would go into Kelley's home three days each week and help her to establish routines for the children, to prepare meals, and to transport Kelley and the children on errands and to appointments.
During 1995 and early 1996, a number of home visits were made by CCDHS employees and other social services workers to Kelley's home. Wendy Dixon, a CCDHS social worker, visited Kelley's home on five occasions and found the following during her various visits: dirty dishes in the kitchen; full trash bags throughout the home, a room that "was completely full of trash"; a cat litter box in the kitchen; a non-working furnace; a toilet that "wouldn't flush" and that "was filled"; a five-inch serrated knife lying on the living room floor; an open can of paint; an electric heater directly beside a pull-out bed; ashtrays and cigarettes "all over the place"; "turkey laying on the counter that looked like beef"; no refrigerator; and a broken window between a bedroom and porch, with "a can of formula [on the porch] that [Kelley] was trying to keep cold."
On March 7, 1996, a homemaker went to Kelley's home for her usual visit. Upon seeing the condition of the home and children, the homemaker left to alert the Springfield Police Department. Officer Richard Mitchem received the call and went to Kelley's home. Regarding the condition of the home, he testified to the following:
 It was quite cluttered, a lot of debris on the floor, clothing, dirty diapers, articles of food and what not. * * * [There was a] lot of food debris on the stove top, table top, floor. It was quite cluttered, quite filthy.
* * *
 [T]here wasn't a clean place to sit or stand in the entire apartment. You would have to actually clean something in order to have something to sit down [on]. I would-I wouldn't sit down there.
* * *
 [T]here were sharp objects that could injure the children laying about.
* * *
 I do remember the conditions [of the apartment]. I can still see it in my mind. Depending on what room you were in, you found things that would normally belong in that room, but not the way you would normally find them. In other words, in the kitchen, there was food; but there was food on the floor. There was food on the stove. There was food on the walls, dried food, old food. Clothes were in the living room strewn about, dirty diapers, ashtrays, some of them overturned. Just filthy everywhere * * *.
When asked how long he believed it would have taken to clean the apartment, he stated that it would have taken "a couple of days * * * working all day * * * with help." He testified that it would have taken a few hours just to put the trash in trash bags and get the dirty clothes ready to be laundered. Further, Kelley's apartment had not had any heat for two weeks and Officer Gary Wilson testified that he would have estimated it to have been fifty-five degrees in the apartment. The homemaker, who did not testify at trial but whose notes were presented as evidence by her supervisor, reported the following regarding the condition of the home:
 * * * The children were freezing. Ron [Jr.] and Chastain had a cold [sic]. They both were not dressed. Ron [Jr.] had a dirty diaper only. Cameron had an undershirt on. Amanda was wrapped in a blanket. [The children] had not eaten breakfast. This was at 12:30 [p.m.]. They had tried to fix food for themselves and [had] broke[n] eggs everywhere.
Officer Wilson also testified that when he had arrived, two of the children had been in diapers only and one had had on only a shirt.
As a result of the conditions of the home and children, the police gave CCDHS law enforcement custody of the children and Officer Mitchem charged Kelley with three counts of child endangering. CCDHS was granted temporary custody of the children through a dependency adjudication in April 1996.
At the time of removal, McCormick was not present because he had been incarcerated in 1995 for passing bad checks. Although Kelley had informed the social workers on her case of the location where McCormick was incarcerated, CCDHS did not give him notice of the children's removal until December 1996.
Dr. James Duffee, a pediatrician and board certified child psychiatrist, testified regarding the children's conditions at the time of removal. Ron Jr. had had a number of bruises on his hands, buttocks, and feet, lacerations on his scalp, and a puncture wound on his foot. Dr. Duffee concluded that Kelley's "failure to obtain appropriate medical care for this group of injuries * * * made [him] very concerned that * * * [Ron Jr.] at least had been neglected" and that possibly some of his wounds had been "inflicted." Chastain had had asthma and recurring reactive airway disease, which had been aggravated by Kelley's heavy smoking. Chastain had had a bald spot on the back of her head which "is a very uncommon finding" on a six-month old child that could have indicated that she had been "allowed to remain in one position for a long enough period of time that the hair [had] not [been] allowed to grow or [had] actually [been] rubbed off the back of her head." Chastain had been developmentally delayed, as she had not been sitting up or pulling up and had been unable to control the trunk of her body. Chastain's heel cords had been tight and there had been abnormal tightening in her back, possible indications that the child had been lying on her back for extended periods of time. Dr. Duffee concluded that Chastain's condition had been consistent with reactive detachment disorder, which is caused by "substantial substandard parenting interactions." He further concluded that he had "no reluctance to say [that Chastain had been] neglected in the first few months of life and exhibited * * * fine motor, gross motor, social, and communications delays as a result of the neglect." The parties stipulated that Kelley had failed to properly immunize the children and had not taken them to get normal well-child checkups.
After the children were removed, CCDHS was unable to locate Kelley between July and November 1996. Kelley was eventually found and Soundra Cline, a CCDHS social worker, was later assigned to her case in August 1996. Cline developed a case plan with eight objectives for Kelley to complete to work toward reunification with her children. In June 1997, Cline developed a case plan for McCormick with similar objectives.
Dr. Steven Zartman, a psychologist, evaluated Kelley and McCormick by interviewing them individually, administering a MMPI and a Parent Stress Index to them, and observing each of them interact with the children during an hour visitation period. His summary of his assessment of Kelley was as follows:
 * * * Kelley [is] a person who came from a dysfunctional background, who has had difficulty functioning in many ways as an adult, [and is] a person who does not have a psychological clinical disorder, but does have a personality disorder which is pervasive and has negative implications for her functioning as a person and as a parent.
 I was concerned about the relationship with her child [sic] in terms of the bond and nurturance and her capacity and competence as a parent.
 I was concerned about [her] responsiveness to would-be helpers, professionals who might want to educate and assist her in parenting. * * * Given her personality, * * * she would not be receptive of those, that she would be suspicious of those and more likely would be the kind of person that would say, "I don't need your help. I know what I'm doing" even though she might not know what she was doing.
* * *
 [T]he other concerns I do have is about the alcohol use, whether that has been addressed and is in check or not because I do view that as a potentially gray factor that would impair her ability to parent.
Dr. Zartman did not, however, offer an opinion as to whether the children should be returned to Kelley because he felt that factors other than solely his evaluation should have been included in the decision and his evaluation was somewhat outdated as it had taken place a year before the trial.
Dr. Zartman's conclusions regarding McCormick were as follows:
 * * * I concluded that [McCormick] was a person who didn't have a clinical psychological disorder. However, there were signs of personality traits and behaviors that were a great concern for me in terms of his parenting of the children.
 I was concerned that he might overlook and downplay problems that exist with the children, that in reacting to problems and stresses, that he might be impulsive, use poor judgment, and even be aggressive.
 I was concerned that alcohol abuse could be a major problem that would need to be addressed. And I was concerned by the fact that [McCormick] didn't seem to place a lot of value on the case plan recognizing that this was really important and that he needed to take initiative to do those things in order to demonstrate that he would be a good parent for the children.
* * *
 Based upon the assessment that I did at that time, I did not think that it would be in the children's best interest to be placed with him * * *. And that at a minimum, that he would have to successfully complete the case plan in order to be given due consideration for reunification.
Kelley's testimony varied from the state's version of the events. Although she admitted that she did not remember exactly what had happened on the day of the children's removal, she testified that Ron Jr. had had on a pair of sweat pants, that Chastain had had on a one-piece outfit, and that all three children had been wrapped in blankets. She stated that the children had gotten up between 10:00 and 11:00 a.m. that morning and that they normally "wouldn't get up until maybe an hour before [she] did sometimes." She stated that she was in a "depressive state" at the time the children were removed "[b]ecause [she] was home alone with all three of the children. It was very cold. [She] did not have transportation to take them anywhere. [She] didn't have money to go do the laundry, * * * groceries, things like that."
Kelley stated that Cline was not a supportive case worker but rather just gave her "a list of things to do," without much explanation or help. She further stated that she had complied with the case plan "as best as [she could]." She testified that she had lived too many places to count since the children had been removed, but that she was, at the time of trial, living with McCormick in a one bedroom apartment and working part-time delivering auto parts. She also said that McCormick had made a positive change while incarcerated and that he was "a lot more calm about things" after he had been released.
Kelley also presented testimony from Lisa Mullen, a counselor that Kelley had been meeting with at Cline's request. Mullen testified that Kelley had "progressed enormously in counseling" and recommended that Kelley be reunified with her children. Kelley's mother, Sandra Craig, also testified on her behalf and stated that she would help Kelley in any way that she could should Kelley be reunified with her children.
McCormick presented evidence that he had successfully completed courses in family and parenting skills, stress management, anger and aggression management, a domestic violence program, and an AA/NA program while he was incarcerated. He stated that he had taken such courses to improve his ability to care for the children after his release from incarceration. He said that he had had at least six different jobs and had lived in four different places since he had been released from incarceration. Further, his ex-girlfriend and mother of his two older daughters testified that McCormick had helped her raise their children, that he had never been violent toward her, and that she did not think that he had a problem with alcohol.
In July 1997, CCDHS made a motion for permanent custody of the three children, alleging that Kelley and McCormick had not made efforts to comply with their case plans and that they had not resolved the problems regarding the safety, health, and environment of the children. A hearing took place in February and March 1998. On May 19, 1998, the trial court granted permanent custody of the three children to CCDHS and terminated the natural parental rights and duties of Kelley and McCormick.
Kelley and McCormick filed separate notices of appeal. We consolidated their appeals after noting that both arise from the same trial court entries and involve similar questions of fact and law.
Kelley advances four assignments of error on appeal. Because the issues raised in her third and fourth assignments of error are interrelated, we will address them together. McCormick advances three assignments of error on appeal. We will consider the assignments of error in a manner that facilitates our discussion.
Kelley's first assignment of error is as follows:
 I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING PERMANENT CUSTODY OF THE KELLEY/McCORMICK CHILDREN TO THE CLARK COUNTY DEPARTMENT OF HUMAN SERVICES, AS THE DECISION OF SAID COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.
Kelley argues that the trial court overlooked evidence which demonstrated that placement with Kelley was in the children's best interests.
"The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." Miller v. Miller (1988),37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849. "While the trial court's discretion in a custody proceeding is broad, [however,] it is not absolute, and must be guided by the language of the relevant statute." In re Beal (Oct. 5, 1992) Clark App. No. 2903, unreported, at *3.
Pursuant to the version of R.C. 2151.414(B) in effect when CCDHS's petition was filed, the trial court was permitted to grant permanent custody of a child who had not been abandoned or orphaned to a public children services agency that had temporary custody of the child, if the trial court determined, by clear and convincing evidence, that it was in the child's best interests to do so and that the child could not be placed with either of his parents within a reasonable time or should not be placed with his parents. "Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven." In re Dylan C.
(1997), 121 Ohio App.3d 115, 121, 699 N.E.2d 107, 111, citingCross v. Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus. "An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof." In re Dylan C., 121 Ohio App.3d at 121,699 N.E.2d at 111, citing In re Adoption of Holcomb (1985), 18 Ohio St.3d 361,368, 481 N.E.2d 613, 621.
In its form applicable in the case below, R.C. 2151.414(D) stated:
 In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
The trial court filed two judgment entries with regard to the children in this case: one entry regarding its decision for Cameron Kelley, and one entry regarding its decision for Ron Jr. and Chastain McCormick. With regard to Cameron, the court stated:
 9. The Court further finds that it is in the best interests of the child to grant permanent custody of the child to the Agency for the following reasons:
* * *
 b. The child has not lived with his/her [sic] mother or father for over two years and in fact, has only visited with his mother for periods that were too brief, and too infrequent in the past year.
 c. There is no probability that the parents will be able to provide a safe, secure and appropriate home for the child any time soon.
* * *
 e. The mother cares more for her needs than the needs of the child. The mother doesn't care enough for the child to support her child. A parent that voluntarily and regularly and consistently refuses to support her child under these circumstances should not have the child returned to her. The mother doesn't have the means to support the child.
 f. The child is mentally, physically and emotionally capable of the proper development and growth if placed with an adequate caring adult. The child can best do this in a legally secure permanent home. Neither parent is able to provide such a home.
* * *
 h. Continuing temporary custody would harm the child by continuing the instability experienced in the past. Long term foster care isn't proper as none of the factors required by O.R.C. 2151.353(A)(5) are present.
 i. The child is the loser in this case because it has taken so long for the child's home to be determined. Returning the child to the mother would make the child a greater loser.
With regard to Ron Jr. and Chastain, the court referred to the two children collectively as the "child" and stated:
 9. The Court further finds that [it] is in the best interest of the child to grant permanent custody of the child to the Agency for the following reasons:
* * *
 b. The child has not lived with his/her mother or father for over two years and in fact, has only visited with his mother for period[s] that were too brief, and too infrequent in the past year.
 c. There is no probability that the parents will be able to provide a safe, secure and appropriate home for the child any time soon.
 d. The father does not act as if he loves his child or want[s] to raise either child. The father has done virtually nothing to comply with his case plan, to acquire a safe stable environment or to provide for the needs of his child. The child is doing wonderfully without the father in his life and it would be beneficial for the child to be raised in a safe, stable home. The father has not provided such and has offered no evidence that he can or will provide such a home for his child.
 e. The mother cares more for her needs than the needs of the child. The mother doesn't care enough for the child to support her child. A parent that voluntarily and regularly and consistently refuses to support her child under these circumstances should not have the child returned to her. The mother doesn't have the means to support the child.
 f. The child is mentally, physically and emotionally capable of the proper development and growth if placed with an adequate caring adult. The child can best do this in a legally secure permanent home. Neither parent is able to provide such a home.
* * *
 h. Continuing temporary custody would harm the child by continuing the instability experienced in the past. Long term foster care isn't proper as none of the factors required by O.R.C. 2151.353(A)(5) are present.
 i. The child is the loser in this case because it has taken so long for the child's home to be determined. Returning the child to either the mother of [sic] the father would make the child a greater loser.
Before addressing Kelley's arguments, we note that in her brief, she cited a version of R.C. 2151.414(D) which listed, as the first factor for the court to consider when making an assessment of the child's best interests, "[t]he reasonable probability of the child being adopted, whether an adoptive placement would positively benefit the child, and whether a grant of permanent custody would facilitate an adoption." In 1996, R.C.2151.414(D) was amended and the factor that Kelley cites was deleted from the statute. CCDHS's motion for permanent custody was filed in July 1997. Thus, that factor was not part of the R.C. 2151.414(D) which was applicable to the case below. We also note that the current version of R.C. 2151.414(D), as amended in 1999, is not applicable to this case. Moreover, although the trial court was not required to consider that factor, the trial court's finding that there was a reasonable probability that the children would be adopted was supported by the record. Cline testified that a foster parent of Ron Jr. and Chastain had filed applications to adopt them. Further, she stated that there was a possibility that Cameron's foster mother would like to adopt him, but that the foster mother's decision would depend on another pending adoption and the situation in her household at the time Cameron became available.
Kelley argues that the trial court overlooked evidence which demonstrated each child's interaction and interrelationship with her. In support of her argument, she points out that during the year before the trial, she "took full advantage of her right to visit with the children" and "participated in a parent education program."
Cline testified that she believed that there was "some bond" between Kelley and the children. The evidence reveals, however, that after the children were removed in March 1996, Kelley failed to regularly visit them until December 1996. Cline testified as follows regarding a visitation between Kelley and the children that she had observed in December 1996:
 A. * * * [Kelley] had a very difficult time controlling the children. They were not listening to her.
 The two younger ones almost seemed not to recognize her. Chastain had run out of the room and had grabbed a cord in another room in the visitation room.
Q. What kind of a cord?
 A. It was of a heater, like, an electrical heater that you plug in.
 I was on the phone, and Amanda just stood there and watched; and I put the phone down and grabbed the cord out of Chastain's hands so she wouldn't bite on it. I explained to Amanda that she needed to keep the children in the room.
 Probably about a half hour before the visit was going to end, the children wanted to get out to get back to the foster mom. They were not wanting to stay in there [with Kelley].
Discussing Kelley's later visitations with the children generally, Cline stated, that at the end of the visitations, "[t]he kids are ready to go. They are ready to go [to their foster] home, what they consider home." She also testified, "I have talked directly with [Cameron], and he has stated [that] he does not want to go live with his mother and/or [McCormick]. * * * [H]e definitely enjoys visiting; however, that seems to be where he wants it to cease." Thus, based upon our review of the record, we cannot conclude that the trial court erred in finding that there was not a strong interrelationship between Kelley and the children.
Kelley argues that the trial court overlooked the report of the children's guardian ad litem, which recommended that CCDHS's motion for permanent custody be denied. The trial court's judgment entries state that there was a guardian ad litem's report and mention that it recommended a denial of CCDHS's motion. After diligently searching the record before us, however, we are unable to locate the guardian ad litem's report. The guardian ad litem
did not testify at trial, and it does not appear that he was present throughout the trial. The guardian ad litem's report was mentioned only during closing arguments, when CCDHS's attorney stated that a "theme of inaccuracy flows throughout the whole report." Further, we note that there is a "Report of Guardian Ad Litem" in the record which was filed on February 13, 1997 ("1997 report") and which appears to have been prepared for an earlier hearing in this case. We do not believe, however, that the 1997 report is the same report that was discussed at the trial which is pertinent to this case because the 1997 report "recommend[ed] that the Court strongly consider the permanent removal of [the] children from [Kelley]." Although the guardian ad litem's report is not in the record, the trial court did note the guardian adlitem's conclusions in its judgment entries. Thus, Kelley's argument that the trial court overlooked it is not persuasive.
Kelley also argues that the trial court failed to recognize that, at the time of removal, the children were old enough to have established a relationship with Kelley and that a termination of that relationship would have been detrimental to the children. The record shows after their March 1996 removal, Kelley did not start visiting the children regularly until December 1996, and that during four of the months between March and December 1996, she did not visit them at all. Cline's testimony revealed that after that lack of visitation, Ron Jr. and Chastain "almost seemed not to recognize [Kelley]." Further, at the time of the trial, the children had been removed from Kelley's care for two years. Thus, Kelley's argument is not persuasive.
Further, Kelley argues that she substantially complied with her case plan and that such compliance demonstrated that she could provide a secure and permanent placement for the children. Her case plan listed the following eight objectives: obtain a psychological and parenting assessment; attend weekly visitations with the children; complete a drug and alcohol program; find appropriate housing; learn to budget money; make child support payments to CCDHS; notify Cline of changes in Kelley's address or employment; and attend parenting classes.
The evidence at trial revealed that Kelley had obtained a psychological and parenting assessment from Dr. Zartman. She had failed to regularly attend weekly visitations with her children until December 1996, missing four months of visitation completely. She had completed the drug and alcohol program, but Cline had referred her to the program in November 1996 and Kelley had not attended the program until August 1997. With regard to housing, Kelley testified that she had lived in nine different places since the children had been removed. She stated that Cline had asked her to produce rent receipts from her landlords and that although she could have produced the receipts, she had not done so because "[she] just [hadn't] got[ten] around to [it]." Further, at the time of the trial, she was living in a one bedroom apartment with McCormick and was eight months pregnant.
When asked why she had failed to complete the budgeting course, Kelley said, "I just-I never got around to calling them," even though at the time of trial, she had had over three thousand dollars in outstanding debt to the gas, phone, and electric companies. The parties stipulated at trial that Kelley had never made child support payments to CCDHS. Kelley had failed to notify Cline of changes in her address or employment status. Finally, Kelley had attended only fourteen of forty-six parenting classes. When asked whether she believed she had completed sufficient parenting classes, she admitted that she had "not [attended] as [many] as [she] should have" attended.
In support of Kelley's argument that she had substantially complied with the case plan, she argues that "[t]he [c]ourt gave an entirely unreasonable amount of credibility to the Department's witnesses" because their failure to notify McCormick of the children's removal should have made their testimony questionable. The record revealed, however, that Kelley's own testimony, as discussed supra, supports the trial court's conclusion that Kelley had failed to substantially fulfill the requirements of the case plan. Thus, her argument is not persuasive.
Based upon our review of the record, we cannot conclude that the trial court erred when it ruled that there was clear and convincing evidence to establish that granting CCDHS's motion for permanent custody was in the children's best interests. Kelley's first assignment of error is overruled.
McCormick's second assignment of error is as follows:
 II. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT ORDERED PERMANENT CUSTODY TO CLARK COUNTY DEPARTMENT OF HUMAN SERVICES WHEN THE FATHER HAD BEEN MAKING SINCERE ATTEMPTS TO COMPLY WITH THE CASE PLAN.
McCormick argues that he "had * * * made serious strides towards [sic] obtaining permanent suitable housing, employment and [the] other stipulations of the case plan." He further argues that it had only been about a year since his release from incarceration and that "[o]ne year after release from incarceration is hardly ample time to get one's life back in order, especially when one is trying to comply with case plans that CCDHS came up with
when [he] was not a part of the original problems."
McCormick's case plan listed the following nine objectives: learn to budget money, including obtaining employment and making child support payments to CCDHS; notify Cline of changes in his address or employment; attend parenting classes; complete a drug and alcohol program; get an assessment of his anger management skills; find appropriate housing; show Cline proof of employment or income; attend weekly visitations with the children; and obtain a psychological and parenting assessment.
The evidence at trial revealed that McCormick had failed to complete the budgeting course, even though he had been over three thousand dollars in debt at the time of trial. McCormick testified that after being released from incarceration, he had had the following: one normal job which he had lost after an automobile accident, a non-income job which he had worked in exchange for housing in a trailer; a job painting houses with another person between September 1997 and January 1998, from which he had earned approximately four hundred dollars; and a job with a temporary agency, for which he had worked in at least six different places. He testified that it had been very difficult for him to obtain jobs because of his "felony background." Further, the parties stipulated that he had failed to make child support payments to CCDHS. McCormick explained his failure to pay child support by stating that "[he] couldn't see the fact of getting all the paperwork done and sending it to the companies and then to the state and them [sic] start [a temporary job] and then something happen to where [he would] lose [his] job. * * * [T]here would be paperwork for nothing; and I would be stuck getting another job, and I would have to start it again."
McCormick had notified Cline of some of his address changes, but he admitted that he had not notified her of all of his address and employment changes. McCormick had attended four of the forty-six parenting classes and testified that he had only attended four because "they was garbage * * * [and] [t]hey was stuff [sic] [he] already knew" from attending similar classes while incarcerated. He had completed an assessment in the drug and alcohol program, but had failed to attend counseling sessions after he had been assessed. He testified that he "just didn't bother with [the counseling sessions]" because he did not believe that he needed counseling. He had failed to get an assessment of his anger management skills. McCormick testified that during the year since he had been released from incarceration, he had moved four different times, including moving in with his sister twice. Further, he was living in a one bedroom apartment with Kelley at the time of trial. He testified, however, that at the time of trial, he had saved over four hundred dollars which he planned to use as a deposit on a bigger apartment should he happen to find one that was satisfactory to him.
McCormick had failed to show Cline proof of any income. Although he had regularly attended visitation with the children from August through October 1997, between November 1997 and February 1998, he had attended only two of sixteen possible visits. He testified that he had understood that visitations were part of his case plan, but that his visitations had waned because he was "running out of excuses to tell those kids [sic] why they can't come home with [him]." He also stated that he had dropped Kelley off at visitations, had left, and had later returned to pick her up, because "there was [sic] other things [he] had to do * * *." He had completed the psychological and parenting assessment with Dr. Zartman. Based upon our review of the record, we cannot conclude that the trial court erred in finding that McCormick had not substantially complied with his case plan.
McCormick contends that his argument is supported by In reBeal (Oct. 5, 1992), Clark App. No. 2903, unreported. In that case, we reversed a trial court judgment which had granted permanent custody of two children to CCDHS after finding that the mother "ha[d] put forth considerable effort to try to remedy the conditions that [had] caused her children to be placed outside the home." Beal, Clark App. No. 2903, at *5. The Beal case is distinguishable from the case currently before us. In Beal, the mother had attended many therapy sessions, had willingly entered and completed a drug and alcohol treatment program, had secured stable housing for herself and the children, had obtained a steady job, and had visited the children. Id. at *4. McCormick had not attended counseling sessions, had failed to obtain drug and alcohol treatment, had not secured stable housing or steady employment, and had failed to consistently visit the children. Thus, his argument is not persuasive.
McCormick's second assignment of error is overruled.
McCormick's first assignment of error is as follows:
 I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE McCORMICK CHILDREN TO THE CLARK COUNTY DEPARTMENT OF HUMAN SERVICES AS ITS FINDING THAT IT HAD BEEN SHOWN CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN CAN NOT [SIC] AND SHOULD NOT BE PLACED WITH THE FATHER WITHIN A REASONABLE AMOUNT OF TIME WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AN ABUSE OF THE COURT'S DISCRETION.
McCormick argues that the trial court erred when it concluded that there was clear and convincing evidence that the children could not be placed with him within a reasonable amount of time.
Aside from evaluating the children's best interests, R.C.2151.414(B)(1) required that the trial court find that the children could not be placed with Kelley or McCormick within a reasonable time or that they should not be placed with them. To make this determination, the court was to "consider all relevant evidence." R.C. 2151.414(E). The statute further stated:
 If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *[;]
 (2) Chronic * * * chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time * * *;
* * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
* * *
 (9) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child * * *;
* * *
(12) Any other factor the court considers relevant.
R.C. 2151.414(E). With regard to these five alternative circumstances, the trial court stated:
 [McCormick] has failed to * * * remedy the conditions that caused the child to be removed initially. The children were removed because they did not have a safe, proper and stable home. At no time in the past year has [McCormick] been able to provide such a home for the children. Even as of the date of the hearing, [McCormick] could not tell the Court where he would be living, for how long or with whom, and how he would pay his bills or provide for the needs of the children. He has never provided for these children and there is no indication that he would do so in the future.
 [McCormick] has not substantially completed any portion of his case plan. He did attend some drug and alcohol training but failed to follow the recommendations. [He] did attend some parenting classes [while incarcerated] but failed to complete any meaningful programing upon his release. The Court does not find that the few parenting classes attended by [McCormick] in prison do not [sic] equate to the full range of parenting classes he agreed to in the case plan. [His] contempt for the parenting classes offered by the Department further compels the Court to conclude that he is simply not interested in doing what is necessary to be reunited with his children. Clearly, [he] has not provided for the financial or emotional needs of the child. The Court must conclude that [he] has not materially completed any portion of his case plan.
* * *
 [McCormick] has used alcohol extensively in the past. In spite of his drug and alcohol counseling, he continue[s] to use alcohol.
 [McCormick] has completely failed to support [the children]. Even though he * * * has been physically able to work and earn an income in the year since his release from prison, he has not seen fit to support either child. The complete lack of commitment to the support of his children convinces the Court that [he] simply does not care about them. A father that loves and cares for his child would support his child. The excuses offered by [McCormick] as to why he has been unable to support his children carry no weight. [He] has job skills and is physically capable of working to support his children; neither child should be placed back with him within a reasonable period of time.
* * *
 [McCormick] has failed to visit [the children] for [an] extensive period of time. Though [he] initially visited [them] after agreeing to temporary custody, his visitation dwindled to the point that it became nonexistent. His attitude in the courtroom was problematic as he described his unwillingness to continue to visit so long as his visitation was supervised and so long as the Department continue[d] to prevent the return of the children to their rightful place, in his home. [McCormick] has failed to demonstrate a consistent relationship with them. He has put his disagreement with [CCDHS], the Court and the system ahead of the needs of his children.
* * *
 [McCormick] has been unwilling as well to provide for the basic needs of his children. He has failed to maintain appropriate housing with the basic necessities. His inability to perceive and accept that the children need a loving, stable, nurturing home is apparent from his selfish behavior in the past year.
 [McCormick] has a stormy and unstable relationship with [Kelley]. Their behavior has been violent and there is a reasonable probability that it would be so again in the future. The on again, off again relationship between [Kelley] and [McCormick] causes further instability in the life of [McCormick] and would cause great instability in the lives of the children if they were returned to him.
With regard to R.C. 2151.414(E)(1), McCormick argues that CCDHS did not make diligent efforts to assist him in successfully completing his case plan. He states that CCDHS "seemed to have a bias against him from the start[,]" as evidenced by its failure to notify him when the children were removed from the home.
We agree with the trial court's statement that the failure of Wendy Russell, the caseworker assigned to the case at the time of the children's removal, to notify McCormick of the children's removal "should be cause for censure and discipline." In our review of the record, however, we did not find further evidence that CCDHS was biased against McCormick. In fact, the record showed that CCDHS had attempted to assist him in completing his case plan. Cline testified that she had given him referrals to various programs and counselors. Further, she stated that she had discussed the case plan with him "in a lot of detail" and had explained what he had needed to do, where he had needed to go, and why the objectives had had to be completed.
Regarding R.C. 2151.414(E)(2), McCormick argues that there was no evidence that he had abused alcohol in the past or that he continued to use alcohol as of the date of the trial. The record revealed that McCormick had previously been arrested for driving under the influence of alcohol. McCormick testified that since being released from incarceration, he had used alcohol but not to an excess. Aaron Lockwood, a chemical dependency counselor that had counseled McCormick between August and October 1997, testified that McCormick had been given three drug screens during that time and that all three had been negative. Lockwood stated that he had recommended that McCormick abstain from alcohol use. McCormick testified, however, that he had continued to be a casual drinker. Based upon our review of the record, we cannot conclude that there was clear and convincing evidence that McCormick had had a chemical dependency on alcohol at the time of the trial. The trial court's entry only stated, however, that he had used alcohol in the past and continued to use it despite his alcohol counseling, and this statement was supported by the record. Although we do not believe that this evidence was sufficient to satisfy the second alternative circumstance, the statute only required that one alternative circumstance be met, and as we discussed supra, there was evidence to meet the first alternative circumstance.
Regarding R.C. 2151.414(E)(4), McCormick argues that he "had to fight tooth and nail to get CCDHS to begin visitation." Regardless of how much difficulty he may have had in obtaining visitation, he failed to consistently exercise it, as discussedsupra. Further, he stipulated during the trial that he had not supported the children by paying child support to CCDHS.
Regarding R.C. 2151.414(E)(9), he argues that the trial court failed to consider his abilities to raise the children apart from Kelley's abilities. The trial court's judgment explicitly separated its findings as to the abilities of McCormick and Kelley, so his argument is not persuasive.
Regarding R.C. 2151.414(E)(12), McCormick argues that the other factors the court discussed were inappropriate and points out that the guardian ad litem had urged the court to deny CCDHS's motion and that Dr. Zartman had stated that the interaction between McCormick and the children had been positive. As statedsupra, the guardian ad litem's report is not in the record. Further, although Dr. Zartman stated the interaction was positive, his overall assessment concluded that it would not be in the children's best interests to be placed with McCormick.
As none of McCormick's arguments are persuasive, his first assignment of error is overruled.
McCormick's third assignment of error is as follows:
 III. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO CCDHS WITHOUT FIRST DETERMINING THE BEST INTERESTS OF THE CHILDREN PURSUANT TO 2151.414(D).
McCormick argues that the trial court erred when it failed to consider the children's wishes regarding permanent custody.
R.C. 2151.414(D)(2) in its form applicable to the case below stated that the court was to consider "[t]he wishes of the child[ren], as expressed directly by the child[ren] or through the child[ren]'s guardian ad litem, with due regard for the maturity of the child[ren]." At the time of the trial, all three children were under the age of six. Based upon the record, it does not appear that the trial court talked directly to the children to learn of their wishes. It appears, however, that the trial court did learn of the children's wishes through the guardian ad litem's report, as the trial court noted that report in its judgment entry. Thus, McCormick's argument is not persuasive.
McCormick's third assignment of error is overruled.
Kelley's second assignment of error is as follows:
 II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ACTING IN A MANNER BIASED IN FAVOR OF THE DEPARTMENT OF HUMAN SERVICES IN THAT SAID COURT CONTINUALLY ASSISTED THE DEPARTMENT OF HUMAN SERVICES' ATTORNEY IN HIS PRESENTATION OF SAID DEPARTMENT'S CASE.
Kelley argues that the trial court was biased against her and that such bias was shown when the trial judge suggested how CCDHS's attorney could lay the proper foundation for a question and when he asked CCDHS witnesses leading questions.
"[A] trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity." Okocha v. Fehrenbacher
(1995), 101 Ohio App.3d 309, 322, 655 N.E.2d 744, 752, citingState v. Wagner (1992), 80 Ohio App.3d 88, 93, 608 N.E.2d 852,856. "The existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party." Okocha, 101 Ohio App.3d at 322, 655 N.E.2d at 752, citingIn re Adoption of Reams (1989), 52 Ohio App.3d 52, 59,557 N.E.2d 159, 166.
Kelley points to two examples in support of her argument. One example was the judge's questioning of Officer Mitchem, who had been present at Kelley's home on the day of the children's removal. On direct examination, Mitchem had testified that Kelley's home had been "filthy." After the attorneys finished questioning him, the trial judge asked Mitchem:
 Q. Why was [her home] different [than other homes which you have visited on domestic calls]? You just told me dirty and filthy.
A. Yes, extremely so. * * *
Q. Well, what was it? Were there toys on the floor?
 A. No. As I indicated before, there wasn't a clean place to sit or stand in the entire apartment. * * *
 Q. Was there something beyond food and clothing that was strewn about? Was there hardware or automotive parts or —
A. There were automotive -[.]
At that point, Kelley's attorney objected to the judge's questioning and the judge responded, "I appreciate your objection, but overruled. I'm interested in-I don't understand what he means by `filthy.'"
The second example Kelley cites occurred when CCDHS requested to show a videotape of the conditions of Kelley's home on the day of the children's removal. Kelley's attorney objected to the videotape, arguing that the tape was not relevant and that its probative value was outweighed by its prejudicial nature. In response to the objection, the judge responded:
 Since it is not a trial to the jury but to the Court, I'll decide that. At this time I'm willing to allow to you [sic] proceed with showing the videotape taken at the-I didn't quite hear the question; and, in fact, [Officer Wilson] said he met the mother at her apartment in March of [19]96. The foundation might be that this particular tape deals with that particular day of removal. One can come to that conclusion, but that particular objection is appropriate. If [CCDHS's attorney] ask[s] that one additional question, I have no problem with it. I don't know what videotape you have.
These examples certainly do not manifest bias against Kelley. Throughout the trial, the judge routinely questioned many of the parties' witnesses to clarify their earlier testimony or to address issues which the attorneys had failed to address. Such actions did not manifest a bias against any of the parties, but rather showed that the trial court was, in effect, attempting to gain as much information as possible and to clarify that information before making its ruling. Thus, Kelley's argument is not persuasive.
Kelley's second assignment of error is overruled.
Kelley's third and fourth assignments of error are as follows:
 III. THE TRIAL COURT ERRED BY ALLOWING THE CLARK COUNTY DEPARTMENT OF HUMAN SERVICES TO PRESENT IRRELEVANT EVIDENCE AT THE TRIAL CONCERNING APPELLANT MOTHER'S FAILURE TO HAVE HER CHILDREN IMMUNIZED.
 IV. THE TRIAL COURT ERRED BY ALLOWING THE CLARK COUNTY DEPARTMENT OF HUMAN SERVICES TO PRESENT PREJUDICIAL EVIDENCE AT THE TRIAL CONCERNING APPELLANT MOTHER'S FAILURE TO HAVE HER CHILDREN IMMUNIZED.
Kelley argues that evidence regarding her failure to have the children properly immunized was irrelevant and thus should have been excluded pursuant to Evid.R. 402.
Pursuant to the former R.C. 2151.414(E), one of the alternative circumstances that would have required the trial court to conclude that the children could not be placed with Kelley was as follows:
 (9) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
During the trial, the parties stipulated that Kelley had failed to take the children to well-child checkups and to have them properly immunized. Dr. Duffee testified that Kelley's failure to obtain appropriate medical care for Ron Jr.'s bruises, lacerations, and puncture wound had made him concerned that Ron Jr. had been neglected. Further, while the trial was in progress, Chastain had surgery performed on her kidneys to repair a valve which had been causing her to suffer from urinary tract infections and reflux, a condition that had been causing significant injury to her right kidney. In an exhibit admitted during trial, Dr. Stephen Koff, the Chief of Pediatric Urology at the Children's Hospital in Columbus, stated as follows:
 It is entirely possible that had [Chastain] received idealized medical care and had been promptly treated for urinary infections in the past, that this scarring and injury to the kidney could have been prevented. * * * This surgery is essential to protect her kidneys, and she will require close, consistent and regular follow-up after surgery that will involve repeated office visits, diagnostic testing, and urine checks. * * * If she does not receive timely and proper care, medication and office visits following surgery, her kidneys are at risk of further injury. I can not [sic] stress strongly enough that it is essential for this child to be maintained on continuous antibiotics for the next several months following surgery and to have visits and testing performed at properly timed intervals. Otherwise, there is significant medical danger to her. In this regard, I would recommend that no [sic] attempts be exhausted to prevent her from any type of medical or environmental neglect during the next 18 months to two years.
Kelley's failure to assure that the children received their well-child checkups and immunizations was relevant to the trial court's determination of whether she could have provided basic necessities which the children would have needed to avoid suffering neglect. Her history of failing to assure that the children were given appropriate medical attention was particularly relevant to Chastain's need for consistent and reliable care following her surgery. Thus, the trial court did not err in ruling that such evidence was relevant.
Kelley further contends that even if the evidence was relevant, the prejudicial nature of such evidence outweighed its probative value and thus it should have been excluded pursuant to Evid.R. 403(A). Because this evidence was highly relevant, we cannot conclude that the trial court erred in ruling that its probative value was not outweighed by "the danger of unfair prejudice." Evid.R. 403(A). Kelley's argument is not persuasive.
Kelley's third and fourth assignments of error are overruled.
The judgment of the trial court will be affirmed.
GRADY, P.J. and YOUNG, J., concur.
Copies mailed to:
Roger A. Ward.
S. Todd Brecount.
Linda J. Cushman.
HON. JOSEPH N. MONNIN.